IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN A. KING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 CV 0456 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| PMI-EISENHART, LLC, ACOSTA SALES ) | |
| AND MARKETING, INC., ACOSTA SALES ) | |
| AND MARKETING COMPANY, ACOSTA ) | |
| SALES AND MANAGEMENT, and ) | |
| ACOSTA, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan King filed a three-count complaint against her former employer, alleging violations of Title VII of the Civil Rights Act, ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, et seq., and the Equal Pay Act as enacted as part of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq. Defendants have filed the instant motion for summary judgment. For the following reasons, defendants' motion is granted.

## FACTS

From 2001 to 2007, plaintiff worked for defendants ("Acosta"), a food brokerage company. Prior to her employment with Acosta, plaintiff had worked as an account manager for another food brokerage company, which ceased operating in 2001, at which time Acosta acquired some of its accounts and employees, including plaintiff. Acosta quickly promoted plaintiff to business manager, which meant she was responsible for managing a retail grocery

store's business in a particular market. During plaintiff's employment, she had a number of disturbing encounters with male coworkers.

The incidents of which plaintiff complains date back to 2001, when one of plaintiff's coworkers, Tom Connelly, gave plaintiff copies of romantic poems he had written for her. Then in February 2002, he showed plaintiff a photograph of himself dressed as a flasher on Halloween. In May of that year, Connelly gave plaintiff a pornographic videotape and a sex toy, telling her that he thought she would need them because she was newly divorced. Things between plaintiff and Connelly escalated in September 2004, when he called her the "c-word" during a business meeting. This incident was reported to Human Resources, and Connelly was disciplined and told to stay away from plaintiff. Some time later plaintiff and Connelly worked together again, without further incident.

Connelly, however, was not plaintiff's only problem at Acosta. In 2002, the office's general manager, Gary Moe, invited her out for after-work drinks with him and some other employees. When she arrived at the bar, only Moe and Ed Burke, another supervisor, were there. Moe told plaintiff that he had a dream about "moving her hair and kissing her neck." Plaintiff immediately left the bar. Also in 2002, plaintiff was told by an unidentified individual that she should "watch out" for Moe because of the way he stared at her and because he had allegedly had an affair with his secretary.

Plaintiff also complains about the behavior of her supervisor, Mike Puttrich. Puttrich referred to her as "Suzie Big Hair," commented on female coworkers' appearance, and in 2006, described a female coworker's tattoo as a tramp stamp. Puttrich told plaintiff that because a

female employee had been "blackballed" because she complained about a client's sexual advances.

Finally, plaintiff reports a few other incidents that occurred in 2004. That year, plaintiff received a company award. A manager made a remark that plaintiff believed downgraded the significance of the award, and on the trip to accept the award, plaintiff's coworkers shunned her. Also in 2004, plaintiff was told that she would be unable to attend a client meeting in Miami, Florida, but she ended up going to the meeting.

Within the 300 days leading up to plaintiff's filing of her EEOC charge, the following incidents took place. Puttrich told plaintiff that Gary Moe liked it when her hair was curly and that Moe paid more attention to her when she wore skirts. Puttrich referred to another employee as "Pass-Around Patti," and some of plaintiff's coworkers told her that Ed Burke, another coworker, "used Acosta as a dating pool." Finally, plaintiff thought that her assistant, Ms. Michell Seter, was providing her with inadequate support. She complained to Puttrich, who supervised both plaintiff and Seter. In July 2007, she was given ten additional account lines to sell on a temporary basis. On August 2, 2007, plaintiff indicated that she was prepared to quit.

Over a month later, on September 10, plaintiff resigned. After resigning, she complained to Human Resources that Puttrich received better support from Seter because the two of them were having an affair. Acosta Human Resources representatives investigated the complaint and concluded that Puttrich and Seter had not had an affair. They both deny having an affair, and plaintiff offers no evidence other than her own speculation that the affair occurred. Other than this complaint and her 2004 complaint regarding Connelly, plaintiff did not make any complaints to Acosta's Human Resources department.

On October 15, 2007, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").

## DISCUSSION

**I.     Legal Standard**s

Summary judgment is appropriate when the moving party shows that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and must support that assertion by citing to materials in the record. Fed. R. Civ. P. 56(c)(1)(A). Once the movant has met that burden, the nonmoving party can defeat summary judgment by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993) (citations omitted). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

II. Analysis

A. Count I: Violation of Title VII

**Hostile Work Environment Claim**

Title VII prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). To establish a claim for a sexually hostile work environment, plaintiff must show that: "(1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability." Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004).

As a general rule, in Illinois "a complainant must file a charge with the EEOC within 300 days of [an] alleged discriminatory act and failure to do so renders the charge untimely." Filipovic v. K&R Express Sys., Inc., 176 F.3d 390, 396 (7th Cir. 1999). Further, an employee who endures a hostile work environment can impute liability under Title VII for acts that occurred before the 300-day statute of limitations if an act contributing to the claim occurs within the filing period and the prior acts are shown to be part of the same claim. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105, 112-19 (2002). Because plaintiff has failed to present evidence that establishes a hostile work environment in the 300 days before her charge, or that establishes a continuing pattern before the 300-day window, her hostile work environment claim is untimely.

Within the 300-day window, plaintiff alleges that her supervisor, Mike Puttrich, diverted her assistant away from her work and instructed the assistant to help others instead of plaintiff.

5

She further alleges that her assistant was receiving favorable treatment because she was having a consensual affair with Puttrich, but that is not a valid basis for a hostile work environment claim. Schobert v. Ill. Dept. of Transp., 304 F.3d 725, 733 (7th Cir. 2002) ("Whether the employer grants employment perks to an employee because she is a protégé, an old friend, a close relative or a love interest, that special treatment is permissible as long as it is not based on an impermissible classification.").

As evidence of a hostile workplace within the 300-day window, plaintiff also provides her testimony that her supervisors made lewd and inappropriate comments. Most of these remarks, however, were made outside of plaintiff's presence and the others are isolated instances. As the Seventh Circuit has explained, "an objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made by supervisors or co-workers out of her hearing, and the rest is isolated and not particularly severe." Whittaker v. N. Ill. Univ., 424 F.3d 640, 645 (7th Cir. 2005) (internal quotations and citations omitted).

Moreover, the evidence of incidents outside the 300-day window is not sufficient to establish a hostile work environment based on a continuing pattern. The most serious incidents involve plaintiff's coworker Tom Connelly, who on separate occasions gave plaintiff poems he wrote about her (in 2001), showed her a picture of himself dressed in a flasher costume (also 2001), gave her a sex toy and a pornographic video (in 2002), and referred to her using the "c-word" (2004). All of these incidents occurred at least several years before plaintiff filed her charge, and Connelly had not been employed by Acosta for more than a year before plaintiff

filed her charge. Further, plaintiff reported the 2004 incident (though not the earlier incidents), after which Acosta disciplined Connelly and no more incidents took place.

The other incidents plaintiff alleges are, even taken together, insufficient to support a claim for hostile work environment. See Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (rejecting hostile work environment claim based on incidents, occurring over a seven-month period, in which the alleged harasser called the plaintiff a "pretty girl," made grunting noises when she wore a skirt, and made lewd gestures).

For these reasons, although plaintiff's workplace was far from ideal, it did not rise (or sink) to the level of actionable hostility that is required to support a Title VII claim.

**Sex Discrimination Claim**

Plaintiff also alleges that defendants violated Title VII by discriminating against her based on her gender. See 42 U.S.C. § 2000e-2(a)(1). To establish this claim, a plaintiff may use either the direct method of proof or the indirect burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under the indirect method, the plaintiff must establish a prima facie case of discrimination based on her membership in a protected class. To establish a prima facie case of sex discrimination, she must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). Establishing a prima facie case creates a presumption of discrimination, and the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the challenged action. If the

7

defendant meets that burden, the plaintiff must then establish that those proffered reasons were mere pretext. See, e.g., Gordon v. United Airlines, Inc., 246 F.3d 878, 885-86 (7th Cir. 2001).

Plaintiff has not provided evidence under either the direct or indirect methods of proof establishing that she suffered an adverse employment action, which is a necessary element of her prima facie case. Plaintiff alleges that she was constructively discharged, but she has not provided evidence to substantiate this claim. Constructive discharge can occur in two different forms. Swearnigen-El v. Cook County Sheriff's Dep't, 602 F.3d 852, 859 (7th Cir. 2010); Fischer v. Avanade, Inc., 519 F.3d 393, 409 (7th Cir. 2008). First, constructive discharge occurs when an employer makes an employee's working conditions so intolerable that resignation qualifies as a fitting response. Pa. State Police v. Sutlers, 542 U.S. 129, 133-34, 141 (2004); Roby v. CWI, Inc., 579 F.3d 779, 785 (7th Cir. 2009).

Plaintiff fails to meet this stringent requirement. Her case for constructive discharge is that after she complained in 2004 about her coworker's lewd and inappropriate behavior, defendants retaliated by "dumping more accounts" on her and providing her with inadequate support staff. She argues that these actions would have prevented her from meeting her performance goals, and she would ultimately have been fired. But to show that she was constructively discharged based on intolerable working conditions, plaintiff needs to present far more egregious conduct. Plaintiff has not presented evidence that even begins to approach the type of egregious facts necessary to establish constructive discharge. Simpson v. Borg-Warner, 196 F.3d 873, 877 (7th Cir. 1999) (constructive discharge exists only where there are "intolerable working conditions that involved a series of escalating sexual remarks culminating in a physical assault or death threat"); see, e.g., Taylor v. W. & S. Life Ins. Co., 966 F.2d 1188,

8

1191 (7th Cir. 1992) (constructive discharge when the plaintiffs' boss constantly peppered them with racist comments and brandished a pistol and held it to one plaintiff's head); Brooms v. Regal Tube Co., 881 F.2d 412, 417, 423 (7th Cir. 1989) (constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a coworker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her).

Further, if plaintiff proceeds under this constructive discharge theory, she must show working conditions that were "even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000). Because, as explained above, plaintiff has failed to show that her work conditions met the standard for hostile work environment, she certainly cannot reach the more stringent requirements for constructive discharge. See Whittaker, 424 F.3d at 648-49.

Neither does the evidence allow plaintiff to proceed under the second theory of constructive discharge, under which the plaintiff must show that her employer's actions would communicate to a reasonable employee that she will be terminated, and that plaintiff then resigned. Swearnigen-El, 602 F.3d at 859; Fischer, 519 F.3d at 409. Under this form of constructive discharge, a plaintiff must demonstrate more than the prospect of being fired at the conclusion of an extended process. Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 333-34 (7th Cir. 2004). "The proverbial axe must literally be about to fall." Hayden v. Loyola Univ. Med. Ctr.,10 C 3825, 2010 WL 4386843, at *2 (N.D. Ill. Oct. 27, 2010), citing E.E.O.C. v. Univ.

9

of Chicago Hosp., 276 F.3d 326, 332 (7th Cir. 2002) (employee who arrived at work to find her personal belongs packed and her office used for storage was constructively discharged under the axe-about-to-fall theory). Here, however, the facts demonstrate that because plaintiff took time to consider whether she would resign, she could not have believed her termination was imminent. She first threatened to quit in August 2007, then finally resigned in mid-September of that year, and continued to work for two weeks after she gave notice. Plaintiff does not allege that defendants did anything in between August and September that would have communicated to plaintiff that she was about to be fired—or, for that matter, that defendants did anything at all besides give her additional work and less support. Plaintiff's evidence thus fails to provide any support for a constructive discharge theory.

**Retaliation**

Plaintiff alleges that defendants violated Title VII by retaliating against her complaints of sex discrimination (which then caused her constructive discharge). See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter."). As with other sex discrimination claims, a plaintiff may use either the direct or indirect methods of proof to establish a claim for retaliation. The indirect method requires the plaintiff to establish that she was performing her job to her employer's satisfaction, and after lodging a complaint about discrimination, only she, and not any otherwise similarly situated employee who did not complain, was subjected to an adverse employment action. Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 642 (7th Cir. 2002). Because, as discussed above, plaintiff has not

established that she suffered an adverse employment action, her claim must fail and summary judgment for defendants is appropriate.

**Failure to Promote**

Finally, plaintiff advances a failure to promote theory, under which she must establish that: (1) she belongs to a protected class; (2) she applied and was qualified for the position she sought; (3) she was rejected for the position; and (4) the person selected was both outside the protected group and not more qualified than plaintiff. Fisher, 519 F.3d at 402. Plaintiff's evidence demonstrates that shortly before she resigned in September 2007, she expressed interest in a director position that had recently become available. The individual who was ultimately selected instead of plaintiff received the position, according to the decisionmaker, based on prior management experience. Thus, because the uncontroverted evidence shows that the person who was selected for the promotion instead of plaintiff was more highly qualified, plaintiff cannot establish a failure to promote claim.

**B.     Count II: Violation of the Equal Pay Act**

To establish a prima facie case of wage discrimination under the Equal Pay Act, a plaintiff must show that: (1) higher wages were paid to a male employee; (2) for equal work requiring substantially similar skill, effort, and responsibilities; and (3) the work was performed under similar working conditions. Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998). The burden then shifts to the defendant to show one of four statutory defenses establishing a gender-neutral reason for its compensation decisions: (1) a seniority system; (2) a

merit system; (3) a system that measures earnings by quantity or quality of production; or (4) a differential based on any factor other than sex. Warren v. Solo Cup Co., 516 F.3d 627, 630 (7th Cir. 2008). Next, plaintiff may rebut this statutory defense by showing that it is merely pretextual.

Defendants have provided gender-neutral explanations for each of the comparable male employees who earned more than plaintiff, and although plaintiff asserts that defendants' explanations are pretextual, she provides no support for that position. Contrary to plaintiff's assertions, defendants have indeed provided sufficient gender-neutral reasons for the difference in pay between plaintiff and each male comparator. Plaintiff, who does not have a college education, critiques these gender-neutral explanations, arguing that, for example, defendants were not entitled to give higher salaries to college-educated employees ("A college degree does not matter if equal work is being done."). Education level, however, is certainly a gender-neutral consideration that defendants were allowed to weigh in making compensation decisions. Defendants' other gender-neutral explanations—higher performance ratings, more experience, and higher prior salary before Acosta employment—are similarly sufficient, even if plaintiff disagrees with defendants' business judgment in using them.

Ultimately, the ten male comparators whom plaintiff claims were paid more than she all had superior performance, all had college degrees (four also had graduate degrees), and all had either significantly more relevant experience or had been identified as having leadership potential and were thus chosen for Acosta's leadership development program. In comparison, plaintiff had generally inferior performance, no college degree, and comparatively minimal business experience. Thus, because plaintiff has offered no evidence demonstrating that

defendants' gender-neutral reasons are pretextual, she cannot establish a claim for wage discrimination.

## C.    Count III: Violation of the ADEA

Plaintiff has failed to mount any argument in support of her ADEA claim, and her sole evidence of age discrimination, that defendants appointed younger employees to chair various committees,[1] is insufficient to survive summary judgment. The ADEA makes it unlawful for an employer to discriminate against an employee "because of" the employee's age, language that the Supreme Court has interpreted to mean that a plaintiff must show her age was the but-for cause of the challenged employment action. 29 U.S.C. § 623(a); Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2350-52 (2009); Mach v. Will County Sheriff, 580 F.3d 495, 498 (7th Cir. 2009). An ADEA plaintiff has two ways to avoid summary judgment: the familiar direct and indirect methods of proof. Because plaintiff has failed to present any argument attempting to establish her ADEA claim through either of these methods, she has waived her ADEA claim. It is not the court's obligation to research and construct a party's argument for her. See 330 W. Hubbard Restaurant Corp. v. United States, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties,

---

[1] Defendants' L.R. 56.1 statement of facts include the following statement: "Plaintiff's only evidence of age discrimination is that she believes younger employees were given an opportunity to act as committee chair." Putting aside the problem that plaintiff's belief is not "evidence," it is unclear whether plaintiff disputes this statement. Her response (which also includes nonresponsive statements regarding her unequal pay claim) actually appears to agree: "Plaintiff does believe younger employees were given opportunities to act as committee chairs."

especially when they are represented by counsel.") (internal citations and quotations omitted); Perry v. Sullivan, 207 F.3d 379, 383 (7th Cir. 2000) ("Even if this argument made sense, Perry cited no authority for this proposition and devoted less than one sentence in the brief to it. Therefore, it is deemed waived.").

Even were the court to consider plaintiff's ADEA claim, plaintiff has not established the necessary elements of such a claim. An ADEA plaintiff must satisfy the elements of either the direct or indirect methods or proof. To prove an ADEA claim using the direct method, a plaintiff may supply either "direct evidence, such as near-admissions by the employer, [or] more attenuated circumstantial evidence that suggests discrimination albeit through a longer chain of inferences." Faas v. Sears, Roebuck & Co., 532 F.3d 633, 641 (7th Cir. 2008) (internal quotations and citations omitted). There is no evidence of anything approaching an admission that plaintiff was not selected to chair the committee because of her age. Plaintiff, therefore, would need to provide sufficient circumstantial evidence to demonstrate a genuine issue of material fact. See Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 491 (7th Cir. 2007). Plaintiff testified that she thought age was a factor in defendants' decision not to appoint her to chair a committee, but this uncorroborated testimony alone is insufficient to supply the sort of circumstantial evidence suggesting age discrimination.

Neither has plaintiff provided any evidence that would allow her to prove her case indirectly through the McDonnell Douglas burden-shifting method. McDonnell Douglas Corp, 411 U.S. at 802-03; Oxman v. WLS-TV, 846 F.2d 448, 452 (7th Cir. 1988) (extending the McDonnell Douglas test to ADEA cases). Using this method, a plaintiff establishes a prima facie case of age discrimination if she shows: (1) she was in the protected class (age 40 or older); (2)

14

she was performing his job satisfactorily by meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was replaced by someone substantially younger, or younger similarly-situated employees were treated more favorably. Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996). If the plaintiff establishes her prima facie case, the burden of production shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. Id. If the defendant succeeds, the burden shifts back to the plaintiff to present evidence that the proffered non-discriminatory reason is pretextual. Id. The plaintiff may show "either that a discriminatory reason more likely motivated the employer, or that the employer's proffered explanation is unworthy of credence." Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1163 (7th Cir. 1994). At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. See Hughes v. Brown, 20 F.3d 745, 747 (7th Cir. 1994).

Here, the first requirement of the McDonnell Douglas test is not at issue; plaintiff was born in August 1956, and no one disputes that she was over forty when the alleged age discrimination occurred in July 2006. But even if plaintiff's deposition testimony that all of the individuals who were appointed to chair the committees were in their twenties were sufficient to establish the second element of the McDonnell Douglas test, plaintiff has provided no evidence to satisfy the final two elements. She has not established that she was meeting defendants' legitimate expectations. Nor has she shown that failing to be appointed as a chairperson for a charity drive constitutes an adverse employment action. See Traylor v. Brown, 295 F.3d 783, 789 (7th Cir. 2002) (holding that plaintiff had suffered no adverse employment action when she had "suffered no loss in title or job responsibility, and [had] presented no evidence, other than her

15

own conjecture, to establish that she suffered a deprivation of the "building blocks" for promotion"). Consequently, the record before the court could not support a prima facie ADEA claim, even if plaintiff had advanced such an argument.

## **CONCLUSION**

For the foregoing reasons, the court grants defendants' motion for summary judgment.


**ENTER:** **February 10, 2011**

_____
**Robert W. Gettleman
United States District Judge**